TAIWAN, (also known as, for the purpose of this proceeding, "Governmental Authorities of Taiwan"); Taipei Economic and Cultural Representative Office in the U.S. (formerly known as the "Coordination Council for Northern American Affairs") and Overseas Chinese Affairs Commission, Petitioners,

v.

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, Respondent,

No. 97–70375.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 5, 1997.

Decided Oct. 16, 1997.

Charles Bond, Charles Bond & Associates, Berkley, CA, David J. Yang, San Francisco, CA, for Petitioners.

Eugene A. Brodsky, Brodsky, Baskin & Shapiro, San Francisco, CA, for Real Party in Interest.

Irene M. Solet, United States Department of Justice, Washington, DC, for Amicus Curiae.

Before: SNEED, FLETCHER, and REINHARDT, Circuit Judges.

SNEED, Circuit Judge:

This case is before us on a petition for a writ of mandamus. The issue before us is a limited one. We must decide the scope of testimonial immunity accorded to employees of the Taipei Economic and Cultural Representative Office (TECRO) under the Taiwan Relations Act (TRA).

This issue arises from a suit for the wrongful death of Peter Sun who drowned in the waters off southern Taiwan while on a Study Tour organized by the government of Taiwan through certain of its agencies.

## I.

## BACKGROUND

### A. *The Taiwan Relations Act and its Implementing Agreement*

When the United States established relations with the People's Republic of China in 1979, it severed diplomatic relations with Taiwan. However, in order to maintain a formal relationship with Taiwan, Congress enacted the Taiwan Relations Act, 22 U.S.C. §§ 3301–3316, to provide a structure for "the continuation of commercial, cultural, and other relations between the people of the United States and the people on Taiwan." *See* 22 U.S.C. § 3301(a)(2) (1994). Under the TRA, those relations are to be conducted by a nonprofit corporation called the American Institute in Taiwan (AIT) on behalf of the United States, 22 U.S.C. § 3305(a), and by a counterpart "instrumentality" on behalf of the people on Taiwan. *See* 22 U.S.C. § 3309(a) (1994). That Taiwan counterpart instrumentality is TECRO, which was formerly known as the Coordination Council for

North American Affairs (CCNAA). *See* Exec. Order No. 12,143, 44 Fed.Reg. 37,191 (1979) (recognizing CCNAA as the instrumentality with authority to act on behalf of Taiwan), and Exec. Order No. 13,014, 61 Fed.Reg. 42,963 (1996) (recognizing TECRO as CCNAA's successor). In essence, TECRO performs functions similar to the functions performed by embassies of countries with whom the United States maintains diplomatic relations.

The Taiwan Relations Act authorizes the President to extend to TECRO "and its appropriate personnel, such privileges and immunities ... as may be necessary for the effective performance of their functions" upon the granting of comparable privileges and immunities to AIT and its personnel by Taiwan. *See* 22 U.S.C. § 3309(c). In 1980, AIT and TECRO's predecessor, CCNAA, the so-called "counterpart organizations," concluded the "Agreement on Privileges, Exemptions, and Immunities between American Institute in Taiwan and the Coordination Council for North American Affairs" (Agreement). The Agreement provides that "[t]he archives and documents of the sending counterpart organization shall be inviolable at all times and wherever they may be." Agreement, Article 5(c). With regard to employees, the Agreement states that "[d]esignated employees of each sending counterpart organization shall be immune from suit and legal processes relating to acts performed by them within the scope of their authorized functions, unless such immunity be specifically waived." *Id.*, Article 5(e). Finally, each counterpart organization shall enjoy in the other's home country "immunity from suit and legal processes equivalent to those enjoyed by public international organizations in the United States." *Id.*, Article 6(b).

### B. *Facts and Procedural History*

In 1993, the deceased, Peter Sun, participated in an Overseas Chinese Youth Language Training and Study Tour (Study Tour), a program for young adults of Chinese origin living outside Taiwan. The Study Tour is organized by the government on Taiwan, through two of its agencies known as the Overseas Chinese Affairs Commission

(OCAC) and the China Youth Corps (CYC).[1] While on a Study Tour swimming excursion in southern Taiwan, Peter Sun drowned. His parents and brother, American citizens living in Illinois, filed suit for wrongful death and for Sun's pain and suffering.

### 1. Dismissal of the First Amended Complaint

In their first amended complaint, the plaintiffs named TECRO as the sole defendant.[2] TECRO moved to dismiss the suit for lack of subject matter jurisdiction. On October 4, 1995, the district court granted TECRO's motion.

Under the Foreign Sovereign Immunities Act (FSIA), "a foreign state shall be immune from the jurisdiction of the courts of the United States," with a few limited exceptions. See 28 U.S.C. § 1604 (1994). That immunity extends also to "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." See 28 U.S.C. § 1603 (1994). Although the United States does not maintain diplomatic relations with Taiwan, Taiwan is a "foreign state," within the meaning of the FSIA. See 22 U.S.C. § 3303(b)(1) (1994). Moreover, as noted above, TECRO is an instrumentality of Taiwan. Therefore, TECRO is immune from the jurisdiction of U.S. courts, unless one of the exceptions established by the FSIA applies.

The plaintiffs argued that the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2),[3] brings TECRO's activities relating to the Study Tour within the jurisdiction of U.S. courts. While the district court found that the Study Tour was a commercial activity under the FSIA, it concluded that any connection between TECRO's commercial activity in the United States and the events leading to Sun's death was too attenuated to show that the cause of action was based on TECRO's commercial activity.

The court found that the Suns' cause of action was not based on an act performed in the United States or on an act in Taiwan having a direct effect in the United States. The court therefore concluded that it could not assert jurisdiction over TECRO under the FSIA. In addition, the district court found that the complaint failed to establish that TECRO was a proper defendant, since the facts alleged did not support the plaintiffs' position that TECRO was legally responsible for any act or omission by Taiwan, OCAC, or CYC.

The court dismissed the complaint, but granted the plaintiffs thirty days to amend their complaint to allege facts supporting jurisdiction and demonstrating that TECRO was a proper defendant, or to name other defendants.

### 2. The Second Amended Complaint

The Suns filed their Second Amended Complaint, naming as defendants Taiwan, TECRO, CYC, and OCAC (collectively designated here as either Petitioners or Taiwan defendants). On August 26, 1996, the Taiwan defendants moved to dismiss this complaint for lack of subject matter jurisdiction. In support of their motion, the Taiwan defendants submitted, inter alia, the declarations of Kang Seng (Kenneth) Tsai, the Deputy Director of TECRO's Service Division in San Francisco. Tsai's declarations described TECRO's role in representing Taiwan's interests in the United States, discussed TECRO's activities in connection with the Study

---

**1.** The district court's order also refers to an agency known as CCC or CCE. The role of this entity is unclear, but it is irrelevant to the mandamus action.

**2.** The complaint refers to CCNAA, since it was filed before CCNAA changed its name to TECRO. For simplicity, we refer throughout to TECRO.

**3.** The FSIA's commercial activity exception provides:

(a) A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case—
* * *

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2) (1994).

Tour, and provided Taiwanese laws relevant to whether TECRO may be held responsible for the acts or omissions of Taiwan, OCAC, or CYC. The chief purpose of Tsai's declarations was to bolster TECRO's position that the court lacked subject matter jurisdiction.

### 3. *Efforts to Depose Mr. Tsai*

On October 8, 1996, the district court granted the plaintiffs' motion to proceed with discovery and continued the hearing on the Taiwan defendants' motion to dismiss. The plaintiffs submitted interrogatories and document production requests in October and December, 1996. On February 21, 1997, the plaintiffs filed a Notice of Deposition of Mr. Tsai. The Taiwan defendants objected to Tsai's deposition on the ground that he is entitled to "diplomatic" immunity. The plaintiffs moved to compel Tsai's deposition.

On March 13, 1997, the district court granted the motion and ordered Tsai to make himself available for deposition. The court listed seven areas about which Tsai could be questioned:

(1) The structure and responsibilities of the Chinese Cultural Center (CCC), also called the Center for Culture and Education (CCE), from 1990–present. The relationships of CCC/CCE to defendants OCAC, Taiwan, and TECRO.

(2) The functions of the Service Division of TECRO in regard to the Study tour, especially relating to documents received in discovery. The relationship of the TECRO Service Division to OCAC. The regular course of business between TECRO, CCC/CCE, and OCAC, including written communications, reports, and accountings. The financial transactions between these entities from 1990–present.

(3) Whether there are shared facilities utilized by TECRO, CCC/CCE, and OCAC, shared employees, or shared officers. Whether any of these employees, facilities, or officers have been participants in the Study Tour organization or management from 1990–present.

(4) Tsai's knowledge of any counseling and training received by the Service Division, TECRO, CCC/CCE, and OCAC from anyone with regard to the organization and implementation of the Study Tour.

(5) The function of the San Francisco Office of TECRO in coordinating other CCC/CCE officers from 1990–present. The functions of the San Francisco Office of TECRO in hiring, recruiting, assisting, or advising participants, counselors, or administrators of the Study Tour from 1990–present. The involvement of the San Francisco Office of TECRO in handling complaints regarding incidents surrounding conduct of the Tour from 1990–present.

(6) Investigation into matter specifically referred to in each and every one of the declarations filed on behalf of any of the defendants by Mr. Tsai.

(7) Investigation into matter specifically referred to by this Court in its October 3, 1995 Order on page 6, line 23, to page 7, line 1, and page 7, lines 16 through 21.[4]

The Taiwan defendants moved the district court to stay or reconsider its order. On March 27, 1997, the district court denied reconsideration but granted a 14–day stay so that the Taiwan defendants could petition the Ninth Circuit for a writ of mandamus. The Taiwan defendants filed a mandamus petition with this court on April 11, 1997. On April 16, 1997, a motions panel granted Petitioners' emergency motion to stay the order compelling Tsai's deposition until the mandamus action could be heard by a merits panel.

### II.

### *JURISDICTION AND STANDARD OF REVIEW*

■■ Our authority under the All Writs Act authorizes us to "issue all writs neces-

---

4. The listed sections of the district court's October 1995 order referred to TECRO's activities of distributing, accepting, and confirming applications for the Study Tour, accepting payment from participants on behalf of OCAC and CYC, and briefing participants before their departure for Taiwan. The court's order also stated its finding that TECRO did not choose the excursion site or participate in supervising the swimming activity which led to Sun's death.

sary or appropriate in aid of their respective jurisdictions," 28 U.S.C. § 1651(a), including writs of mandamus. However, we cannot issue a writ under the Act "unless it is designed to preserve jurisdiction that the court has acquired from some other independent source in law." *Jackson v. Vasquez*, 1 F.3d 885, 889 (9th Cir.1993). While the district courts have jurisdiction of civil actions against a foreign state, when that state is not immune from jurisdiction under the FSIA, 28 U.S.C. § 1330(a), it is uncertain here whether the Taiwan defendants are immune from jurisdiction under the FSIA. Hence, the district court correctly exercised its jurisdiction for the purpose of ascertaining whether immunity from jurisdiction exists. Similarly, this court considers this petition for mandamus "in aid of" our jurisdiction, 28 U.S.C. § 1651(a)—i.e., to help ascertain whether jurisdiction exists.

■ We acknowledge that mandamus is an extraordinary remedy that "has traditionally been used in the federal courts only 'to confine an inferior court to a lawful exercise of its prescribed jurisdiction.'" *Will v. United States*, 389 U.S. 90, 95, 88 S.Ct. 269, 272, 19 L.Ed.2d 305 (1967) (quoting *Roche v. Evaporated Milk Assn.*, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943)). In determining whether to issue a writ of mandamus, we balance the following five factors (the "*Bauman* factors"):[5]

> (1) whether the party seeking the writ has no other adequate means . . . to attain the relief he desires;
>
> (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal;
>
> (3) whether the district court's order is clearly erroneous as a matter of law;
>
> (4) whether the district court's order is an oft repeated error or manifests persistent disregard for the federal rules; and
>
> (5) whether the district court's order raises new and important problems or issues of law of first impression.

5. These factors are referred to as the *Bauman* factors, because this court first articulated the five factors in *Bauman v. U.S. Dist. Ct.*, 557 F.2d

*Calderon v. U.S. Dist. Ct.*, 98 F.3d 1102, 1105 (9th Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 1830, 137 L.Ed.2d 1036 (1997).

■ On a petition for mandamus relief, we review the district court's underlying order for clear error. *Executive Software North Am., Inc. v. U.S. Dist. Ct.*, 24 F.3d 1545, 1551 (9th Cir.1994). Although all five factors need not be satisfied, "it is clear that the third factor, the existence of clear error as a matter of law, is dispositive." *Id.* Accordingly, we shall first consider whether the district court clearly erred as a matter of law, and then consider briefly the other *Bauman* factors.

### III.

### *DID THE DISTRICT COURT COMMIT CLEAR ERROR?*

At the heart of this case is the district court's March 13, 1997 order compelling the deposition of Kenneth Tsai. Petitioners concede that the court has the power to compel Tsai to appear for deposition. However, the court's order goes beyond that. The district court ordered Tsai *to testify* with respect to the seven matters listed in part I.B above. In other words, the court ordered Tsai not merely to appear for deposition, but also to answer questions.

### A. *The Scope of Testimonial Immunity*

Underlying the district court order is the legal conclusion that "Tsai's [testimonial] immunity only extends to acts performed by him within the scope of his authorized functions." The district court, on the basis of that conclusion, determined that it could order Tsai to testify about the seven listed topics, because those topics do not relate to acts performed by him within the scope of his authorized functions.

In contrast, petitioners contend that Tsai cannot be compelled to answer questions about either: (a) information he learned in the course of performing his official duties; or (b) information derived from documents in TECRO's archives. Accordingly, petitioners

650, 654–55 (9th Cir.1977), *aff'd sub nom. Arizona v. U.S. Dist. Ct.*, 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983).

contend that the seven listed topics all relate to information that is contained in TECRO's archives, or that he learned by performing his official duties. Therefore, it is their position that Tsai's testimonial immunity extends to all seven listed topics.

### 1. *Article 5(e) of AIT–TECRO Agreement*

■■■ Article 5(e) of the AIT–TECRO Agreement states: "[d]esignated employees of each sending counterpart organization shall be immune from suit and legal processes relating to acts performed by them within the scope of their authorized functions, unless such immunity be specifically waived." [6] On its face, this language appears to be consistent with the district court's view. However, there are several compelling reasons for interpreting this provision more broadly.

First, the district court's interpretation of Article 5(e) would have the effect of virtually nullifying Article 5(c) of the Agreement. Article 5(c) states that "[t]he archives and documents of the sending counterpart organization shall be inviolable." This provision prevents a court from directly compelling production of TECRO's documents. However, the protection afforded by Article 5(c) would be practically useless if an employee could be compelled to testify about the contents of the organization's documents simply because such testimony did not concern acts performed by that employee within the scope of his authorized functions. We decline to construe Article 5(e) in a manner that effectively nullifies the clear purpose of Article 5(c).

It is clear that the district court ordered Tsai to testify about subjects related to information contained in TECRO's archives. For example, the court ordered Tsai to testify about: TECRO's functions in regard to the Study Tour; the relationship of TECRO to OCAC; the regular course of business between TECRO and OCAC; and the financial transactions between these entities. A full response to these questions could require extensive disclosure of information obtained from documents in TECRO's archives. Similarly, testimony about the other topics listed in the district court order might also compromise the inviolability of TECRO's archives. Therefore, the district court's order cannot be reconciled with Article 5(c).

### 2. *The International Organizations Immunities Act*

The International Organizations Immunities Act (IOIA), 22 U.S.C. §§ 288–288i, which defines the immunities enjoyed by public international organizations and their employees, is incorporated by Article 6(b) of the AIT–TECRO Agreement. It provides that TECRO shall enjoy "immunity from suit and legal processes equivalent to those enjoyed by public international organizations in the United States." Thus, with respect to TECRO itself, the Agreement effectively incorporates the standards of the IOIA. However, the Agreement does not explicitly incorporate IOIA standards for TECRO employees. Nevertheless, the IOIA's employee immunity provision, 22 U.S.C. § 288d, confers immunity in terms almost identical to Article 5(e) of the AIT–TECRO Agreement. [7] Therefore, it is appropriate to consider section 288d as a guide to the interpretation of Article 5(e).

The Department of State interprets section 288d broadly to provide testimonial immunity for all information that a covered individual possesses solely by virtue of his official position. Brief for the United States as Amicus Curiae, p. 16. This interpretation of the IOIA is entitled to substantial deference in light of the "primacy of the Executive in the conduct of foreign relations" and the Executive Branch's lead role in foreign policy. *See First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767, 92 S.Ct.

---

**6.** Plaintiffs contend that Tsai is not a "designated employee" within the meaning of Article 5(e). For essentially the reasons articulated in the district court's March 13 order, we reject this argument.

**7.** 22 U.S.C. § 288d(b) accords employees of international organizations immunity "from suit and legal process relating to acts performed by them in their official capacity and falling within their functions...." Compare Article 5(e) of the Agreement, which accords TECRO employees immunity "from suit and legal processes relating to acts performed by them within the scope of their authorized functions."

1808, 1812, 32 L.Ed.2d 466 (1972) (plurality opinion). Therefore, we interpret Article 5(e) of the AIT–TECRO Agreement in accordance with the Department of State's interpretation of the IOIA.

### 3. Scope of Article 5(e) Immunity

Specifically, we hold that Article 5(e) of the AIT–TECRO Agreement means that a court cannot compel a TECRO employee to testify about *information he possesses solely by virtue of his official position.* Since all seven topics listed in the district court order relate to information Tsai possesses solely by virtue of his official position, he cannot be compelled to testify with respect to such information about any of those topics. Accordingly, the district court committed clear error as a matter of law by adopting an excessively narrow construction of Article 5(e).

### B. Item Six: Mr. Tsai's Declarations on Behalf of any Defendants

■ In support of their motion to dismiss for lack of subject matter jurisdiction, the Taiwan defendants submitted several declarations. The purpose of those declarations was to provide a factual foundation for the court's ruling as to whether it had subject matter jurisdiction under the FSIA. In item six of the seven topics listed by the district court, the court ordered Mr. Tsai to testify about matters "specifically referred to in each and every one of the declarations filed on behalf of any of the defendants by Mr. Tsai."

Despite the fact that Tsai's testimonial immunity protects him from being compelled to testify about the matters referred to in the declarations, item six differs in crucial ways from the other topics listed in the district court order. First, the Taiwan defendants voluntarily submitted the information in the declarations, whereas they did not volunteer to address the other topics. Moreover, the district court has a compelling reason to seek Tsai's testimony about the matters referred to in the declarations, because the court must ascertain whether the Taiwan defendants are immune from jurisdiction under the FSIA, and the declarations include factual allegations relevant to that jurisdictional issue.

Therefore, we hold that Mr. Tsai must make himself available for deposition to be questioned about the matters referred to in the declarations.

Of course, as already indicated, Mr. Tsai has the right to refuse to answer any question that would reveal information he possesses solely by virtue of his official position. However, his refusal to answer questions about the matters referred to in the declarations should cause the district court to strike the pertinent parts of his declarations or his declaration in its entirety.

## IV.

### THE OTHER BAUMAN FACTORS

■ Turning to the other *Bauman* factors, it is clear that petitioners have no adequate means to obtain the relief they desire, except by means of a writ of mandamus. Hence, the first *Bauman* factor is satisfied. Similarly, the second factor is satisfied because, if we do not grant the writ, "petitioner[s] will be damaged or prejudiced in a way that is not correctable on appeal." *Calderon,* 98 F.3d at 1105. The fourth factor is not satisfied, because the district court's order is not "an oft repeated error [that] manifests persistent disregard for the federal rules." *Id.* The fifth factor is satisfied, because the court's order "raises new and important problems or issues of law of first impression." *Id.* Thus, the *Bauman* factors are adequately satisfied.

## V.

### CONCLUSION

The district court order is clearly erroneous as a matter of law, because the court ordered Tsai to testify about matters within the scope of testimonial immunity accorded under Article 5(e) of the AIT–TECRO Agreement. Three of the other four *Bauman* factors also weigh in favor of granting the writ. Therefore, the petition for a writ of mandamus is GRANTED.

On remand, the district court can order Tsai to make himself available for deposition. The questioning at deposition should be strictly limited to item six on the district

court's list of seven topics—matters specifically referred to in the declarations filed by Mr. Tsai. The district court cannot compel Mr. Tsai to answer such questions. However, in deciding whether the Taiwan defendants are immune from the court's jurisdiction under the FSIA, the district court is entitled to strike Mr. Tsai's affidavit with respect to those factual allegations in the declarations about which Tsai refuses to testify.

WRIT OF MANDAMUS GRANTED AND REMANDED. ·